# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

FILED

SEP - 3 2019

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
7710 Hermitage Drive (formerly 6191 Plank Road), )
Fredericksburg, VA 22407 )

Case No.  3:19- SW255

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
7710 Hermitage Drive (formerly 6191 Plank Road), Fredericksburg, VA 22407, as more fully described in Attachment A, incorporated by reference herein.

located in the _____ Eastern _____ District of _____ Virginia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 21 U.S.C. sections 841, 846 | distribution, possess with intent to distribute and conspiracy to distribute and possess with intent to distribute cocaine, a Schedule II controlled substance. |

The application is based on these facts:

see attached affidavit, incorporated by reference herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:  07/19/2019  ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Nagi Kazzie, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

/S/
David J. Novak
United States Magistrate Judge
*Judge's signature*

Date: _____ 09/03/2019 _____

City and state:  Richmond, Virginia

David J. Novak, U.S. Magistrate Judge
*Printed name and title*

SEP - 3 2019

David J. Novak,
United States Magistrate Judge

## ATTACHMENT A

**7710 Hermitage Drive (formerly 6191 Plank Road), Fredericksburg, VA 22407, (WHITE'S residence)** is described as a single-level, single family residence with brown log siding, a grey composite roof and is identified with the numerals "7710" affixed to a mailbox located at the entrance of the driveway leading down to the residence. The property also includes an oversized 3-bay detached garage located at the end of the driveway and other smaller outbuildings/sheds.



**ATTACHMENT B**
Description of property to be seized

a. Indicia of occupancy, residency, control and/or ownership of the premises and things described in this warrant, such as utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records;

b. Drug paraphernalia, including materials for cutting, weighing, and packaging controlled substances;

c. Personal telephone and address books and listings, letters, telephone bills, photographs, audio and video tapes, digital images, personal digital assistants ("PDAs" or tablets), personal notes and other items reflecting names, addresses, telephone numbers, communications, and/or illegal activities of co-conspirators in narcotics trafficking activities;

d. Narcotics and money ledgers, narcotics distribution and customer lists, narcotics supplier lists, correspondence, notation logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;

e. Electronic communication devices, cellular telephones, tablets, gaming consoles, two-way radios, and other communication devices which evidence participation in illegal drug trafficking in violation of Title 21, United States Code, Sections 841 and 846;

f. United States and foreign currency derived from the sale of controlled substances in violation of Title 21, United States Code, Sections 841 and 846;

g. Bank account records, wire transfer records, bank statements and records, money drafts, letters of credit, safety deposit keys and records, money wrappers, money containers, income tax returns, financial transfers, which reflect payment for or proceeds of the sale of controlled substances in violation of Title 21, United States Code, Sections 841 and 846;

h. Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, money orders and cashier's checks, passbooks, bank checks, bank deposit tickets, certificates of deposit, and memoranda and other items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of money; money counting machines, money wrappers and bags used to carry controlled substances;

i. Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, businesses, precious metals, jewelry, or other items obtained with the proceeds of the sales of controlled substances;

j.  Records, items, and documents reflecting travel for the purpose of participating in narcotics trafficking, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to locations;

k.  Any and all electronically stored data on computers, hard-drives, zip-drives, or portable storage devices described above in categories (a) through (j), including any and all electronic devices and/or computer hardware equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data, including but not limited to, any data-processing devices (such as central processing units, memory typewriters, internal and peripheral storage devices [such as fixed disks, external hard disk, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, and other memory storage devices]); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communication devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks); computer software consisting of digital information which can be interpreted by computer and any of its related components to direct the way they work including, but not limited to, software stored in electronic, magnetic, optical, or other digital form, which commonly includes programs to run operating systems, applications (like word-processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communication programs; computer-related documentation consisting of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items; computer passwords and other data security devices designed to restrict access to or hide computer software, documentation, or data consisting of (but not limited to) hardware, software, or other programming code, encryption devices, chips, and circuit boards.

l.  Safes, lockboxes and other portable locked containers.

3:19 SW255

AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Nagi Kazzie, a Special Agent of the United States Drug Enforcement Administration

(DEA), having being duly sworn, deposes and states as follows:

1.      I am a law enforcement officer of the United States within the meaning of 18

U.S.C. § 2510(7), and am empowered by law to conduct investigations of, and to make arrests

for, the offenses enumerated in Title 18, United States Code, Section 2516, including violations

of Title 21.

2.      I have been a Special Agent with the DEA since August of 1997.  I have been

assigned to various offices to include Chicago, Detroit, Afghanistan, Cyprus, Quantico, and

Washington D.C.  During my tenure with DEA, I have participated in complex international

conspiracy investigations involving organizations responsible for the unlawful manufacturing,

importation, transportation, and distribution of illegal drugs. I have also investigated corruption

and violent criminal offenses related to the activity of DTOs. I have been involved in drug

trafficking investigations of an international, national, and regional scope.

3.      I have attended classes and courses conducted by the DEA regarding the

importation, transportation, and distribution of illegal drugs. I am knowledgeable about state and

federal drug laws. I have participated in a number of drug trafficking, money laundering, and

organized crime investigations that have resulted in the arrest of numerous members of several

different international and domestic DTOs, and the seizure of currency, assets, and drugs.

Several of these investigations have employed electronic surveillance as an investigative

technique, and I have submitted affidavits in the Eastern District of Michigan in support of

applications for court orders authorizing the use of oral and electronic interceptions. I have

directed, supervised, and participated in many searches of the residences and businesses of

1



RECEIVED
SEP - 3 2019
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

suspected drug traffickers for evidence of criminal activity. I have also conducted and participated in the debriefing of many drug traffickers and money launderers, through which I have learned valuable information regarding the techniques used by DTOs to distribute drugs in both domestic and international markets. Additionally, I have testified in numerous grand jury proceedings related to the investigation of individuals involved in drug trafficking and money laundering. As a result of my training and experience, I am familiar with the way in which DTOs illegally traffic, transport, and distribute drugs, and launder the proceeds derived from their drug distribution activity.

4.      Based on my experience as a law enforcement officer, I also know that those involved in drug trafficking rely heavily on telephones to communicate with one another in order to coordinate the smuggling, transportation, and distribution of illegal drugs, and that they frequently employ coded language and slang terminology in an effort to maintain secrecy while engaging in such communications.

5.      Through my employment as a law enforcement officer, I have gained knowledge in the use of various investigative techniques, including the use of wire, oral and electronic interceptions and other types of electronic surveillance, physical surveillance, undercover operations, confidential informants, cooperating witnesses, controlled purchases of illegal drugs, consensually-monitored recordings, investigative interviews, trash searches, mail covers, financial investigations, administrative and grand jury subpoenas, and search and arrest warrants.

6.      Through instruction, training, and participation in investigations, as well through consultation with other agents and law enforcement personnel, I have become familiar with the manner and methods by which narcotics traffickers conduct their illegal business and use of coded words to disguise conversations about their narcotics activities, especially when they are

communicating by telephone. I have had the opportunity to interview individuals involved in narcotics trafficking concerning the various methods by which they operate, to include their use of coded language and the avoidance of specific references to narcotics, and their practice of conducting most or all of their transactions in cash to avoid leaving a paper trail of their narcotics purchases, sales, and proceeds. I have also learned that narcotics traffickers at the higher levels of the trafficking hierarchy tend to avoid or minimize their possession of narcotics to avoid apprehension by law enforcement and that these high level narcotics traffickers tend to operate through intermediaries and "runners" to further minimize their own exposure. In addition, I have learned the measures that narcotics traffickers use to avoid law enforcement surveillance and investigations, such as the development and use of aliases; the use of cellular telephones and other communication devices; the use of other individuals' names for telephones, pagers, assets, vehicles, houses, bank accounts, utilities, etc., in order to avoid the use of their own names being associated with these items and assets; and the use of counter-surveillance driving techniques to detect law enforcement surveillance and avoid being followed by law enforcement.

7.      Through instruction, training, and participation in investigations, as well through consultation with other agents and law enforcement personnel, I have become familiar with the manner and methods by which narcotics traffickers conduct their illegal business and use of coded words to disguise conversations about their narcotics activities, especially when they are communicating by telephone. I have had the opportunity to interview individuals involved in narcotics trafficking concerning the various methods by which they operate, to include their use of coded language and the avoidance of specific references to narcotics, and their practice of conducting most or all of their transactions in cash to avoid leaving a paper trail of their narcotics purchases, sales, and proceeds.

3

8.      I have also learned that narcotics traffickers at the higher levels of the trafficking hierarchy tend to avoid or minimize their possession of narcotics to avoid apprehension by law enforcement and that these high level narcotics traffickers tend to operate through intermediaries and "runners" to further minimize their own exposure.  In addition, I have learned the measures that narcotics traffickers use to avoid law enforcement surveillance and investigations, such as the development and use of aliases; the use of cellular telephones and other communication devices; the use of other individuals' names for telephones, pagers, assets, vehicles, houses, bank accounts, utilities, etc., in order to avoid the use of their own names being associated with these items and assets; and the use of counter-surveillance driving techniques to detect law enforcement surveillance and avoid being followed by law enforcement.

9.      Based on my training, experience, and participation in narcotics and drug-related investigations and the training and experience of other Agents/ TFOs with whom I am working on this investigation, I know that:

a.      Narcotics traffickers often maintain on hand large amounts of U.S. currency in order to maintain and finance their ongoing narcotics business, which are typically proceeds of narcotics trafficking;

b.      Narcotics traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, cashier check receipts, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances, even though such documents may be in code.

c.      Narcotics traffickers often "front" narcotics (provide controlled substances on consignment) to their clients and maintain records to account for the narcotics fronted and the monies owed for those illegal narcotics.  These books, records,

4

receipts, notes, ledgers, and other documents are commonly maintained where narcotics traffickers have ready access to them, including but not limited to residences, offices, vehicles, and storage places;

d.      It is common for narcotics dealers to keep proceeds of narcotics sales and/or records of narcotics transactions, narcotics sources, and narcotics customers in secure locations within residences, businesses, offices, garages, storage buildings, safes, vaults, safe deposit boxes, vehicles, and obscure locations such as storage containers buried underground, in order to conceal such items from law enforcement authorities;

e.      Narcotics traffickers conceal caches of narcotics, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of narcotics transactions, and evidence of financial transactions related to obtaining, transferring, or spending large sums of money made from narcotics trafficking activities in their residences, businesses, offices, garages, storage buildings, safes, vaults, safe deposit boxes, buried in yards and in remote sections of their real property, and/or vehicles;

f.      Narcotics traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers for their associates in the narcotics trafficking organization, these items are typically written in code, and these types of records are sometimes maintained on computers or other electronic data storage devices, including cell phones;

g.      Narcotics traffickers frequently take or cause to be taken, photographs and/or videos of themselves, their co-conspirators and associates, their property, and

their product, and these traffickers usually maintain such photographs and/or videos, in their residences, offices, cellular telephones, or other places or devices under their control;

h. Narcotics traffickers keep paraphernalia for packaging, cutting, weighing, manufacturing, and distributing controlled substances, which includes, but is not limited to, scales, plastic wrap, plastic bags, vacuum sealers, hydraulic presses and press plates, and cutting agents, as well as items designed to mask the odor of illegal narcotics such as soap powder, dryer sheets, ammonia, wood shavings, heat sealers, and plastic wrapping;

i. When narcotics dealers collect proceeds for the sale of illegal narcotics, they often attempt to legitimize or "launder" these profits through sources, including but not limited to, businesses, foreign and domestic banks and their attendant services, cashier's checks, money orders, wire transfers, and bank drafts;

j. Narcotics traffickers commonly utilize telephones, both residential and cellular, and computers and tablets as a means of communication to conduct their illegal narcotics trafficking and these devices often store contact phone number, numbers dialed and numbers from calls received as well as other stored electronic communications such as text messages, direct messages and other messaging programs;

k. Narcotics traffickers often purchase vehicles, businesses, and residences with the proceeds from their drug transactions, and place these assets in the names of other trusted individuals in order to avoid discovery by law enforcement;

l.      The courts have recognized that unexplained wealth is probative evidence of
crime motivated by greed, in particular, trafficking in controlled substances;

m.      Individuals and businesses involved in the illegal distribution of controlled
substances often use computer equipment to document and track their business
affairs, including their illicit sales and disposition of the proceeds of their sales;

n.      There are many reasons why criminal offenders maintain evidence for long
periods of time.  The evidence may be innocuous at first glance (e.g. financial,
credit card and banking documents, travel documents, receipts, documents
reflecting purchases of assets, personal calendars, telephone and address books
and ledgers , check books, video recordings and photographs, utility records,
ownership records, letters and notes, tax returns and financial records, telephone
and cellular phone and data bills, keys to safe deposit boxes, hardware and
software computers), but have significance and relevance when considered in
light of other evidence.  The evidence may be highly valuable to the offender, and
at the same time have great evidentiary value, such as valuable investments (e.g.
art, jewelry, precious metals and stones, real estate, securities), large sums of
currency, drug or money laundering ledgers and owe sheets, safes, customer lists,
communications equipment, vehicles, airplanes, vessels, computers, tablets,
smartphones, counter surveillance equipment (including doorbell cameras and
wildlife cameras set up in remote areas), scales, processing equipment and
packaging materials;

o.      In my experience, illegal narcotics trafficking is a continuing activity that spans
months and even years.  Illegal narcotics traffickers will repeatedly obtain or

7

manufacture and then distribute controlled substances on a regular basis, such as any distributor of a legitimate commodity would purchase stock, and similarly, such narcotics traffickers will have an "inventory" which will fluctuate in size depending upon the supply and demand for the product. Certain types of drug paraphernalia, such as scales for use in weighing amounts of narcotics at the time of purchase, plastic wrap and plastic bags for packaging narcotics for distribution and/or transportation, and hydraulic presses and press plates, used for repackaging diluted or "cut" narcotics, are often kept by a trafficker on a continuous basis for use whenever needed.

p.     Narcotics traffickers keep records evidencing their illegal activities for months or years beyond the time during which they actually possess illegal narcotics, in order to maintain contact with their criminal co-conspirators and associates for future transactions, and so that they have records of prior transactions for which, for example, they might still be owed money, or might owe someone else money;

q.     The longer a drug trafficker is involved in continuous illegal drug trafficking, the more information about and fruits of drug trafficking are accumulated. Drug traffickers safeguard the fruits and instrumentalities of their drug trafficking activities in safe areas such as their private residences and businesses.

r.     Drug traffickers often use the narcotics that they traffic and manufacture and/or other narcotics, and it is not unusual to find personal use quantities of narcotics and paraphernalia consistent with the use of these substances on their persons and on their property.

8

10.     This Affidavit is submitted in support of an application for search warrant authorizing a search of **7710 Hermitage Drive, Fredericksburg, Virginia** (Formerly 6191 Plank Road, Fredericksburg, Virginia), including the curtilage and all dwellings, outbuildings and vehicles located thereon, hereinafter referred to as "the SUBJECT PREMISES," and more fully described in Attachment A, which is incorporated by reference herein.

11.     The application seeks a warrant authorizing the search of the SUBJECT PREMISES specifically identified in Attachment A, incorporated by reference herein, for the items specifically described in Attachment B, which is incorporated by reference herein, that constitute evidence, fruits and instrumentalities of illegal drug trafficking and a conspiracy to do the same in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

12.     The information contained in this affidavit is not intended to include each and every fact and matter observed by or known to the United States and its agents. The facts and information contained in this affidavit are based upon my personal knowledge, information obtained from local, state, and federal law enforcement officers (collectively "agents"), and information provided by cooperating witnesses and confidential sources. The observations in this affidavit that are not my own were relayed to me directly by the person who made them. Information provided by cooperating witnesses and confidential sources has been corroborated by independent information where possible and the information provided by these sources upon which I relied has been determined to be reliable.

13.     Starting before 2014, law enforcement became aware of a large-scale drug trafficking operation ("DTO") utilizing multiple low-level distributors, distributing cocaine and heroin in the Fredericksburg, Virginia, Spotsylvania, Stafford, King George County, Westmoreland County, Colonial Beach and surrounding areas, of Virginia. The organization

9

was distributing primarily from or near residences associated with the DTO members in these areas. Based on the information provided by agents, an investigation was launched into Nathaniel WHITE and his associate's drug trafficking activities. Through the course of this investigation, multiple controlled cocaine purchases were made from WHITE at various locations associated with his drug trafficking organization. Based on these buys, surveillance, and pen register and historical evidence provided by witnesses, sources of information and informants, through this investigation, Agents and the Assistant United States Attorney assigned to this case applied for and received authorization to seek a court order authorizing wire and electronic intercepts for two telephones utilized by WHITE.

## INFORMATION PROVIDED BY COOPERATORS

14.     Cooperating Defendant-1 (CD-1):  In September 2018, Caroline County Sheriff's Office ("CCSO") conducted a traffic stop of CD-1 resulting in the seizure of approximately four ounces of cocaine hydrochloride and one ounce of crack cocaine. CD-1 was charged with possession with intent to distribute a Schedule I/II drug under state law in Caroline County, Virginia. CD-1 agreed to cooperate with agents at that time.  CD-1 has provided information in the hope of receiving some consideration at the time of sentencing. No other form of consideration or inducement has been requested by, or offered to, CD-1. While working as a cooperating defendant, CD-1 provided information that has consistently proved to be reliable. The information provided by CD-1, to the extent possible, has been verified by other investigative techniques.

15.     CD-1's criminal history is as follows: Between 1988 and 2012, CD-1 has been arrested for and convicted of at least four various Virginia misdemeanor and felony violations including felony use of a firearm in the commission of a felony, resisting arrest, indecent

exposure, and drug violations. CD-1's sentences have ranged from thirty days to twelve months in prison in Virginia related to these convictions. In 1997, CD-1 was convicted in United States District Court, Alexandria, Virginia for conspiracy to distribute crack cocaine and received a sentence of 188 months. CD-1's current charges are still pending in Caroline County.

16.     In September 2018, over the course of several discussions, CD-1 told agents that CD-1 had been purchasing cocaine from Nathaniel WHITE, whom CD-1 knows by the alias "Skillet," since 2012. At first, it was "on and off," but by 2015, CD-1 was purchasing greater quantities of cocaine from Nathaniel WHITE on a more regular basis. CD-1 stated that CD-1 was purchasing between two and a half ounces to four and a half ounces ("big eight") of cocaine twice per month from Nathaniel WHITE.

17.     CD-1 stated that Nathaniel WHITE evades detection by law enforcement by using business fronts, including his car dealership and detail business, which is located in Spotsylvania, Virginia. According to CD-1, Nathaniel WHITE also conducts business through several storage units WHITE rents. CD-1 identified the car Nathaniel WHITE regularly had been driving as a grey/silver color Ford Taurus, but added that WHITE drives different vehicles in order to evade law enforcement.

18.     CD-1 provided information on additional WHITE DTO members, including Burton Brown, whom he described as a close associate of Nathaniel WHITE who distributes cocaine and firearms for the WHITE DTO. CD-1 described Marquis WHITE aka "Dotchi," as a relative of Nathaniel WHITE and higher-level member of and enforcer for the DTO. CD-1 advised that various unnamed sources identified Marquis WHITE as being responsible for the 2018 murder of Ike Phelps in the Mayfield area of Fredericksburg, Virginia. Mayfield is an area in Fredericksburg that is controlled by the WHITE DTO.

19.     CD-1 further identified Gregory Ward as the possible source of supply of cocaine

for the WHITE DTO and stated that Ward has ties to high-level cocaine dealers in Washington,

D.C. CD-1 stated that Gregory Ward and Nathaniel WHITE have known each other for over

twenty-five years, through their drug business and the buying and selling of vehicles. CD-1

advised that Gregory Ward was distributing ounces of crack cocaine in the early 1990s. CD-1

explained that in the past WHITE acknowledged he was supplied by Ward.

20.     Over the course of this investigation, CD-1 provided agents with two phone

numbers for Nathaniel WHITE. CD-1 explained that CD-1 always contacted WHITE on one of

the numbers. However, at one point, when WHITE did not respond to messages sent to that

number, CD-1 obtained the second number. Pen register data shows that WHITE was using both

phone numbers to have contact with members and associates of the DTO and CD-1.

21.     Cooperating Defendant-2 ("CD-2") began cooperating with agents in

Fredericksburg, Virginia, in October 2018. CD-2 was cooperating with the hope of receiving

consideration in connection with probation violation charges related to felony forging public

records. No other form of consideration or inducement has been requested by, or offered to, CD-

2. While working as a cooperating defendant, CD-2 provided information that has consistently

proved to be reliable. Agents confirmed that individuals CD-2 identified as being associated

with Nathaniel WHITE were in fact in regular telephone contact with WHITE. Agents were able

to confirm that locations identified by CD-2 as being utilized by WHITE were in fact utilized by

WHITE. The information provided by CD-2, to the extent possible, has been verified by other

investigative techniques. Agents have been attempting to locate CD-2 but at present are unable

to do so.

22.     Between 2000 and 2017, CD-2 was  arrested and convicted in Virginia of at least

thirty-three various state misdemeanor and felony violations including felony forging/uttering;

concealment/price alter merchandise; shoplifting; unauthorized use of a vehicle, boat, or animal;

carrying a concealed weapon; attempted unlawful wounding; grand larceny; false summons or

false report to police; driving while intoxicated; drug violations; fail to return bailment property;

identity theft; elude/disregard police; failure to appear; public swearing or intoxication; and

forging public records.  CD-2's sentences ranged from ten days to two years and six months of

imprisonment in Virginia related to these convictions.

23.     According to CD-2, CD-2 has known Nathaniel WHITE for more than thirty

years, both socially and in the drug business.  CD-2 has known WHITE by the aliases of

"Skillet" and "Junior."

24.     CD-2 stated that Nathaniel WHITE uses his family members and very close

friends to distribute cocaine, heroin, and crack cocaine.  As an example, CD-2 identified several

of Nathaniel WHITE's relatives to whom Nathaniel WHITE provides cocaine for distribution,

including Marquis White, aka "Dotchi," James Jackson, Andre Carey, Leonard Davis, and Justin

Wilson.  CD-2 advised that Nathaniel WHITE provides them with three and a half to four ounces

of cocaine at least twice per week for distribution.  CD-2 further stated that Nathaniel WHITE's

two most trusted confidants are Justin Wilson and his brother, David Wilson, aka "BJ."  CD-2

stated that Nathaniel WHITE always travels with a female companion, and in the past, Latonia

Brown and Shamekia Williams accompanied Nathaniel WHITE on his drug runs.  Additionally,

Latonia Brown in the past has traveled with Nathaniel WHITE to Newport News, Virginia to

pick up drugs.

25.     CD-2 stated that Nathaniel WHITE has two drug sources of supply.  CD-2 identified Nathaniel WHITE's primary source of supply as a black male who resides in the Baltimore, Maryland area, and drives a white pickup truck. CD-2 advised that Nathaniel WHITE meets with this source of supply at the MGM National Harbor located in Oxon Hill, Maryland; which agents corroborated through cell site location data on WHITE's telephone on November 28, 2018 (see paragraphs 37-40 below).  CD-2 advised that WHITE has  a second source of supply located in Newport News, Virginia.  According to CD-2, Nathaniel WHITE uses this source of supply when his Baltimore, Maryland source of supply is moving too slowly.

26.     CD-2 stated that Nathaniel WHITE stores his drug proceeds in a black makeup bag.  Furthermore, upon completing his drug transactions, Nathaniel WHITE keeps the drugs in the center console of his vehicle.  CD-2 advised that prior to conducting drug transactions and meeting with his sources of supply, Nathaniel WHITE inspects his vehicle for tracking devices and is very careful when driving in order to evade detection by law enforcement.

27.     CD-2 explained that Nathaniel WHITE uses various methods to evade law enforcement.  CD-2 gave as an example that Nathaniel WHITE has a side job selling cars at his car dealership for the purpose of "throwing off" law enforcement and as a front for WHITE's drug trafficking operations.  CD-2 stated that Nathaniel WHITE attempts to evade law enforcement by using several different vehicles, including but not limited to: a silver Audi, a burgundy Chevrolet Tahoe, and a white pickup truck.  Additionally, Nathaniel WHITE uses "burner" phones and communicates through Facebook Messenger in order to evade law enforcement.  According to CD-2, Nathaniel WHITE's accounts are registered under other people's names and his longtime girlfriend's name, Velvet Carter.  CD-2 explained that Velvet

14

Carter is aware of Nathaniel WHITE's drug trafficking operations and has transported drugs for him in the past.

28.     CD-2 believes Nathaniel WHITE lives in the Battlefield Estates section in Spotsylvania, Virginia, and advised that WHITE "cuts-up" or mixes his cocaine and manufactures crack cocaine in his home.  CD-2 explained that Nathaniel WHITE has several different units in a storage facility and believes he uses these storage facilities to store his drugs and run his car businesses.  CD-2 stated that Nathaniel WHITE had an office inside of Shanks Towing, located in Fredericksburg, Virginia, that seemed suspicious because Nathaniel WHITE did not do much business related to his car dealership at that location. CD-2 estimated that Nathaniel WHITE was earning approximately $20,000 per month in drug proceeds. CD-2 stated that, in the last six years, CD-2 has witnessed approximately 400 drug transactions conducted by Nathaniel WHITE and has seen WHITE in possession of a total of approximately fifty kilograms of cocaine, approximately 120 grams of heroin, and approximately 500 grams of crack cocaine.

29.     On November 11, 2018, law enforcement officers in Fauquier County, Virginia and HSI agents stopped Stacey Labaniel Cephas in Remington, Virginia.  Cephas was found to have approximately 1 kilogram and 9 ounces of cocaine hydrochloride and $54,965 in United States Currency in his possession at the time of the stop.  Cephas had $2,030 in his pocket and $600 in his wallet.  The agents found an additional $5,000 in the driver's door pocket of the car. The remaining $47,335, along with the kilogram of cocaine and the separately packaged 9 ounces of cocaine, were found in a secret compartment in the vehicle.  After being advised of his Miranda warnings and waiving his rights, Cephas told law enforcement that the separated-out 9 ounces of cocaine hydrochloride had come from a guy with the nickname of "Skillet." Cephas described "Skillet" as a cocaine dealer out of Fredericksburg (Virginia), who was not as big as

Cephas's other supplier who had supplied the kilogram of cocaine. Cephas explained that the money in the vehicle was supposed to go to "the guy" (referring to the other supplier identified by Cephas) who was going to California that night and bring back five to ten kilograms of cocaine. Cephas said that he was supposed to meet "the guy" in Maryland with the money. Cephas was charged with possession with intent to distribute cocaine and was held on a $2,500 bond. He bonded out later that evening and absconded. Cephas became the target of a Title III intercept on or about January 30, 2019. Agents arrested Cephas on or about February 17, 2019. He is not cooperating at this time.

## CONTROLLED BUYS

30.     On Friday, September 28, 2018, at the direction and in the presence of agents, CD-1 exchanged a series of text messages with Nathaniel WHITE over one of his identified telephones to arrange a meeting in the parking lot of Shanks Towing located at 1313 Alum Springs Road, Fredericksburg, Virginia to buy 35 grams of cocaine for $1,300. CD-1 explained that based on years of working together, CD-1 and Nathaniel WHITE have always used car references as code. By asking for "27 inch rims" CD-1 was indicating he needed a 62-ounce quantity of cocaine.

31.     At approximately 12:50 p.m., agents equipped CD-1 with an audio/video recording device and $2,750. The agents searched CD-1 and CD-1's vehicle for contraband and found none. Physical surveillance was established at the location of the controlled purchase. At approximately 2:08 p.m., agents observed CD-1 meet with Nathaniel WHITE. At approximately 2:22 p.m., agents observed Nathaniel WHITE depart the location in a black Chevrolet van, bearing Virginia license plates VPZ2831, which was registered to Gregory Tyrome Ward. CD-1 had previously identified Gregory Ward as an associate of the WHITE DTO and suspected to be

a drug source of supply for Nathaniel WHITE. Agent's maintained surveillance on the

Chevrolet van as Nathaniel WHITE followed CD-1 for a short time. Once Nathaniel WHITE

proceeded to travel in a separate direction, agents were unable to maintain surveillance on

WHITE's vehicle. Following the controlled buy, CD-1 met with agents at a pre-determined

rendezvous point and turned over the suspected drugs that CD-1 purchased from WHITE and

gave the agents $1,450 back of the buy money. CD-1 was again searched for any contraband

and none was found. CD-1 confirmed that Nathaniel WHITE had just sold CD-1 the drugs that

CD-1 had just surrendered to agents. CD-1 explained that WHITE told him he only had 35

grams, for which CD-1 paid $1,300. The drugs were sent to a DEA laboratory for further

analysis and determined to be 29.35 grams of a mixture and substance containing cocaine

hydrochloride.

32.    On October 11, 2018, at the direction and in the presence of agents, CD-1

exchanged a series of text messages with Nathaniel WHITE over one of WHITE's identified

telephones to arrange to meet at 1908 Howard Avenue, Fredericksburg, Virginia to buy 2.5

ounces of cocaine.

33.    CD-1 explained that the car reference meant that CD-1 was looking to "re-up"

(meaning to get more cocaine) at the regular amount that he normally would get, which was a

"62," meaning 62 grams of cocaine. At approximately 12:30 p.m., agents equipped CD-1 with

an audio/video recording device and $2,750. Agents searched CD-1 for contraband and found

none. Physical and aerial surveillance was established at the planned location of the controlled

purchase. At approximately 1:07 p.m., agents observed a silver Ford Taurus, bearing Virginia

license plates VVG8751, and registered to Gregory Ward's mother, Clara Belle Ward, of 7451

Comorn Road, King George, Virginia, enter the parking lot of a 7-Eleven convenience store

located in the area of the prearranged meet location. The 7-Eleven is directly across from a Gulf gas station where CD-1 was waiting for WHITE. Agents had previously identified this vehicle as a vehicle driven by Nathaniel WHITE. Agents maintained surveillance on the Ford Taurus as it drove to the rear of the 7-Eleven, exited onto South Street and proceeded to the 1900 block of Howard Avenue. Agents observed CD-1 depart the Gulf gas station and park near Nathaniel WHITE in the Ford Taurus. At approximately 1:16 p.m., agents observed CD-1 and WHITE enter CD-1's vehicle for a brief moment and then WHITE exited CD-1's vehicle. CD-1 then departed the area and met with agents at a pre-determined rendezvous point, where CD-1 turned over the suspected drugs that CD-1 purchased from WHITE. CD-1 was again searched for any contraband and none was found. CD-1 confirmed that Nathaniel WHITE had just sold CD-1 the drugs that CD-1 had just surrendered to agents. The drugs were sent to the DEA laboratory for further analysis and were determined to be 61.78 grams of cocaine hydrochloride.

34.     On October 24, 2018, at the direction and in the presence of agents, CD-1 exchanged a series of texts with Nathaniel WHITE over one of WHITE's identified telephone numbers to arrange to meet at 4729 Jefferson Davis Highway, Fredericksburg, Virginia (TINTLAB) in order to buy 2.5 ounces of cocaine. CD-1 inadvertently erased these initial text messages this day. At approximately 7:45 a.m., agents established surveillance in the vicinity of Nathaniel WHITE's residence, the SUBJECT PREMISES. Agents observed the silver Ford Taurus, used during the prior controlled delivery of cocaine on October 11, 2018, parked in the driveway of the SUBJECT PREMISES. At approximately 1:30 p.m., agents equipped CD-1 with an audio/video recording device and $2,750. They searched CD-1 for contraband and found none. Additional surveillance units were established at the location of the controlled purchase.

35.     At approximately 2:01 p.m., agents observed Nathaniel WHITE enter the Ford

Taurus and depart the SUBJECT PREMISES.  At approximately 2:25 p.m., agents observed

Nathaniel WHITE arrive at the Tint Lab Window Tinting business located at 4729 Jefferson

Davis Highway, Fredericksburg, Virginia.  This business had been identified by agents as being

operated by Alberto Clarke Jr., a member of the WHITE DTO.  At approximately 2:27 p.m.,

agents observed CD-1 arrive at this meet location.  Several minutes later, agents observed

Nathaniel WHITE exit the business and enter his Ford Taurus.  Shortly thereafter, CD-1 was

observed entering the Ford Taurus.  A few minutes later, CD-1 exited the Ford Taurus and

entered into CD-1's vehicle and departed the area.  Agents observed multiple unidentified

individuals meeting in front of the Tint Lab Window Tinting and decided to terminate further

surveillance on Nathaniel WHITE's vehicle.   Following the controlled buy, CD-1 met with

agents at a pre-determined rendezvous point and turned over the suspected drugs that CD-1 had

purchased. CD-1 was again searched for any contraband and none was found. CD-1 confirmed

that Nathaniel WHITE had just sold CD-1 the drugs that CD-1 had just surrendered to agents.

The drugs were sent to the DEA laboratory and determined to be 65.50 grams of a mixture and

substance containing cocaine hydrochloride.

36.     On November 7, 2018, at the direction and in the presence of agents, CD-1

exchanged a series of texts with Nathaniel WHITE over one of WHITE's identified telephone

numbers to arrange the purchase of 2.5 ounces of cocaine.

37.     Based on this text message exchange, the CD explained that the two agreed to

meet at the Fredericksburg Ambulatory Section of Mary Washington Hospital, located at 1201

Sam Perry Boulevard, Fredericksburg, Virginia for WHITE to distribute a 62-ounce quantity of

cocaine to CD-1.  At approximately 12:30 p.m., agents equipped CD-1 with an audio/video

19

recording device and $2,750.  Agents searched CD-1 for contraband and found none. Physical surveillance was established at the location of the controlled purchase.  At approximately 3:57 p.m., agents observed CD-1 arrive at Mary Washington hospital and enter the black Chevrolet van, registered to WHITE DTO associate Gregory Ward, which was the same van previously observed during the controlled buy on September 28, 2018.   Following the drug transaction, CD-1 exited Ward's van and notified agents that Nathaniel WHITE had identified a law enforcement vehicle on surveillance.  At approximately 4:05 p.m., agents observed Nathaniel WHITE depart the hospital parking lot in Ward's van.  Surveillance was maintained on Nathaniel WHITE as WHITE traveled into a housing development in Chancellorsville Estates, near the SUBJECT PREMISES.  Agents were unable to maintain surveillance on Ward's van. Following the controlled buy, CD-1 met with agents at a pre-determined rendezvous point and turned over the suspected drugs that CD-1 had purchased. CD-1 was again searched for any contraband and none was found. CD-1 confirmed that Nathaniel WHITE had just sold CD-1 the drugs that CD-1 had just surrendered to agents. The drugs were sent to the DEA laboratory for further analysis and was determined to be 65.30 grams of a mixture and substance containing cocaine hydrochloride.

38.     On November 28, 2018, between 10:00 a.m. and 11:00 a.m., at the direction of and in the presence of agents, CD-1 exchanged a series of texts with Nathaniel WHITE over one of WHITE's identified telephone numbers to arrange the purchase of 2.5 ounces of cocaine from Nathaniel WHITE.

39.     CD-1 explained that based on their typical coded language, CD-1 wanted to purchase sixty-two grams of cocaine for $2,750 U.S. currency at 12:00 p.m.  Nathaniel WHITE replied via text to CD-1: "At airport picking up my daughter back in about 2 hours."   At the

time, agents were monitoring WHITE's telephone's movement pursuant to a court issued

tracking warrant. The tracking data indicated that WHITE's telephone was traveling northbound

toward the MGM National Harbor Casino in Oxon Hill, Maryland. Based on information

provided by CD-2 that WHITE would meet his source of supply at MGM, agents went to MGM

and obtained the video surveillance for that day. The surveillance showed Nathaniel WHITE

arrive at and enter the MGM parking deck at 10:46 a.m., driving the silver Ford Taurus

registered to Ward's mother. A black sports utility vehicle (SUV) bearing Maryland license

plates and registered to Wesley Bernard Turner in Waldorf, Maryland, was following close

behind WHITE's vehicle. The two vehicles backed into spaces next to one another in an area

that was at the far-end of the camera's range. Four minutes later, WHITE left the spot and

stayed in the parking lot for approximately 2 minutes and then exited the parking garage at 10:52

a.m. WHITE started heading back toward Fredericksburg and at 10:57 called Ward's phone,

202-717-6530, from WHITE's telephone that the agents were tracking and talked for almost 25

minutes. Physical surveillance picked up WHITE at 11:07 a.m. as he was heading southbound

and confirmed that he was the only passenger in the car. The location data does not show that

WHITE went to the airport. Based on my experience, I believe that WHITE's text to CD-1 was

code and that WHITE was letting CD-1 know that he was picking up drugs.

  40. On this same date, between 2:00 p.m. and 2:30 p.m., at the direction and in the

presence of agents, CD-1 again exchanged a series of texts with Nathaniel WHITE over one of

WHITE's identified telephonesto finalize plans for the pending drug transaction.

  41. At approximately 2:09 p.m., agents equipped CD-1 with $2,750 and an

audio/video recording device. Agents searched CD-1 for contraband and found none. At

approximately 3:35 p.m., agents established surveillance at the Popeye's. At approximately 3:44

21

p.m., agents observed CD-1 arrive at the Popeye's.  At approximately 3:48 p.m., agents observed

Nathaniel WHITE arrive at the Popeye's in a silver Ford Taurus registered to Ward's mother,

and park next to CD-1's vehicle.  Agents observed CD-1 enter the passenger side of the Ford

Taurus, which then proceeded through the drive-thru of Popeye's.  At approximately 3:53 p.m.,

agents observed CD-1 exit the Ford Taurus and return to CD-1's vehicle.  Shortly thereafter,

agents observed Nathaniel WHITE depart the location.  Agents maintained surveillance on the

Ford Taurus as it arrived and parked in front of a residence located at 1107 Dixon Street,

Fredericksburg, Virginia.  Agents observed Nathaniel WHITE exit the Ford Taurus and meet

with an unidentified adult black male and enter the residence.  Surveillance was terminated at

this time.  Following the controlled buy, CD-1 met with agents at a pre-determined rendezvous

point and turned over the suspected drugs that CD-1 had purchased. CD-1 was again searched for

any contraband and none was found. CD-1 confirmed that Nathaniel WHITE had just sold CD-1

the drugs that CD-1 had just surrendered to agents. The drugs were sent to a DEA laboratory for

further analysis and were determined to be 61.45 grams of cocaine hydrochloride.

42.     On December 28, 2018, at the direction and under the supervision of agents, CD-1

exchanged a series of texts with Nathaniel WHITE one one of WHITE's telephones to arrange to

meet at Popeye's Chicken restaurant, located at 1903 Plank Road, Fredericksburg, Virginia to

buy 2.5 ounces of cocaine.

43.     CD-1 explained that these text messages meant that CD-1 arranged to purchase a

62-ounce quantity of cocaine from WHITE and that they were meeting at the Popeye's chicken

restaurant.

44.     At approximately 12:05 p.m., agents equipped CD-1 with $2,750 and an

audio/video recording device.  Agents searched CD-1 for contraband and found none. Physical

surveillance was established at the Popeye's. At approximately 12:20 p.m., agents observed CD-1 arrive at the parking lot of Popeye's. At approximately 12:45 p.m., agents observed a white pickup truck, bearing Virginia license plates VVH-4243, and registered to Gregory Tyrome Ward, 16680 Harwood Oaks Ct, Apt 302, Dumfries, Virginia, park next to CD-1's vehicle. At that time, agents observed an adult black male, who was later identified by CD-1, exit the passenger side of the pickup truck and enter Popeye's restaurant. Shortly thereafter, agents observed CD-1 exit CD-1's vehicle and enter the passenger side of the white pickup truck. At approximately 12:50 p.m., agents observed CD-1 exit the passenger side of the pickup truck, return to CD-1's vehicle and depart the location. Agents maintained surveillance on the white pickup truck and positively identified the driver of the vehicle as Nathaniel WHITE. At approximately 12:55 p.m., agents observed the pickup truck depart the area of Popeye's restaurant and terminated surveillance shortly thereafter. Following the controlled buy, CD-1 met with the agents at a pre-determined rendezvous point and turned over the suspected drugs that CD-1 had purchased. CD-1 was again searched for any contraband and none was found. CD-1 confirmed that Nathaniel WHITE had just sold CD-1 the drugs that CD-1 had just surrendered to agents. The drugs were sent to the DEA laboratory for analysis and were determined to be 60.09 grams of cocaine hydrochloride.

45.    On Friday, March 01, 2019, at the direction and under the supervision of agents, CD-1 exchanged a series of texts with Nathaniel WHITE to arrange to meet at HEADLINERS AUTO LLC , located at 3980 Lafayette Boulevard, Fredericksburg, VA 22408 to buy 2.5 ounces of cocaine from Nathaniel WHITE. CD-1 had to call WHITE to confirm the meet location. During the conversation, WHITE explained that he did not see the earlier texts from CD-1. WHITE tells CD-1 to meet him at the lot. The CS advised that the "lot" that WHITE had

referred to in the phone call was a small car dealership located on the corner of Lafayette and Harrison road in Fredericksburg, Virginia, subsequently identified as HEADLINERS AUTO LLC, located at 3980 Lafayette Boulevard, Fredericksburg, Virginia 22408. At approximately 4:35 p.m., the CS departed the pre-determined meet location. CS was searched prior to departing the area with negative results.

46. At approximately 5:02 p.m., Fredericksburg Police Detective Matt Deshcenes observed a black conversion van with a silver stripe park next to the CS's vehicle. At that time, Fredericksburg Police Detective Matt Deshcenes observed the CS exit the CS's vehicle and enter the passenger side of the van driven by WHITE. TFO Lewis observed that the van bore Virginia license plate VPZ-2831. A subsequent records check of Virginia license plate number VPZ-2831 indicates it is a black 2003 Chevrolet Express Van, registered to Gregory Tyrome Ward, 16680 Harwood Oaks Court, Apartment 302, Dumfries, Virginia 22026.

47. At approximately 5:04 p.m., the CS exited the van and entered back into the CS's vehicle. A few moments later, CCSO Chatman observed the black colored van driven by WHITE depart the area, as well as, the CS's vehicle. Surveillance could not be maintained on WHITE.

48. At approximately 5:19 p.m., the CS arrived back at the pre-determined meet location followed by SA Kazzie and TFO Sadler. At that time, TFO Sadler acquired Exhibit #9 from the CS. TFO Sadler transferred custody of Exhibit #9 to SA Kazzie who took complete care, control, and custody of the cocaine (Exhibit #9). TFO Sadler searched the CS and the CS's vehicle for narcotics, money and weapons with negative results, as witnessed by SA Kazzie.

24

## WIRE AND ELECTRONIC INTERCEPTS

49.     On March 7, 2019, the Honorable M. Hannah Lauck, United States District Judge for the Eastern District of Virginia, signed the orders authorizing wire and electronic intercepts for two telephone numbers utilized by Nathaniel WHITE.

50.     During the course of the monitoring of WHITE's telephone calls and text messages, agents determined that WHITE was supplying cocaine to a number of relatives and close friends, including his nephew, Marquis White, aka "Dotchi," Perry Deskins, Troy Saunders, Christopher Lewis, aka "Super Chicken," Warren Baker, and others.  Agents were also able to identify one of WHITE's sources of supply: Lance Bishop Steglich, aka "Rock."  During the course of the intercepts, WHITE made arrangements to meet "Rock" to be resupplied and made arrangements to distribute cocaine to those he supplied.  Through the use of location based services, agents were able to track the location and movement of WHITE's telephones.  Agents were thereby able to conduct surveillance during certain meetings of WHITE and his supplier and his distributors.  Also during the course of the intercepts, agents were able to determine that WHITE was living at the SUBJECT PREMISES and was utilizing the SUBJECT PREMISES to conduct his drug trafficking activities.  On most occasions, WHITE left from the SUBJECT PREMISES to meet with his supplier and distributors and would return back to the SUBJECT PREMISES at the end of the day.  WHITE was cautious about allowing anyone other than closest relatives and friends to come to the SUBJECT PREMISES.  Nonetheless, intercepted calls indicated that WHITE did in fact conduct his business from the SUBJECT PREMISES as well as other locations.

51.     The wire and electronic intercepts also indicated that at times WHITE and others were using some other communication applications other than just text messages or voice calls.

25

There were indications that WHITE's phone was in use, but no text or voice was associated with the use. This can occur with the use of encrypted communication applications. Also, there were intercepted text messages that appeared to be responses to messages that did not appear on the wire or electronic intercepts.

### INTERCEPTS WITH SUPPLIER

52.     On March 21, 2019, agents monitoring WHITE'S telephone numbers pursuant to Court Ordered wire and electronic intercepts, intercepted a call at approximately 11:05 a.m., from WHITE to 240-354-8995. That phone has no subscriber, but during a previous call the user of that phone identified himself as "ROCK". The following is a summary of that call:

ROCK: hey what up

NW:    what up bro

ROCK: man everything is good. I wanted to see if you could help me get rid of
           something real quick

NW:    I'll make a couple calls you gotta give me a few I'm at the auction

ROCK: OK not real quick but in the next day or two...like you know what I'm
           saying...cuz I got a decent amount so just trying to (unintelligible)

NW:    you got that other one on standby from yesterday

ROCK: yeah I got that for him tho

NW:    ok alright

ROCK: so if you want to come....you know what I'm saying...in the next hour or so

NW:    ok as soon as I leave I will call you see where we at

ROCK: make some calls and see what you can do

NW:    ok thatl work

26

ROCK: alright

NW:    alright

CALL ENDS.

53.    On March 22, 2019, agents monitoring WHITE'S telephone numbers pursuant to

Court Ordered wire and electronic intercepts, intercepted numerous texts between WHITE and

ROCK. During the course of the day, WHITE sent and received a series of text messages

discussing, in code, amounts of narcotics to purchase (" I goy you and 14"), when and where to

meet with ROCK ("meet at the Mills", meaning Potomac Mills mall area), as well as, discussing

bringing back the "bad thing" (referencing the bad quality of drugs that WHITE sold to

DESKINS and about which DESKINS complained about the quality, set out above).

54.    On March 22, 2019, at approximately 11:20 a.m., agents observed WHITE depart

the SUBJECT PREMISES. WHITE was driving a black Cadillac with Virginia license plate

number UXL-7847, registered to Gregory Tyrome WARD, 16680 Harwood Oaks Ct. Apt. 302,

Dumfries, Virginia. Agents monitored the realtime location data on WHITE's phone, which

placed WHITE driving Northbound on Interstate 95 toward Woodbridge, Virginia. At

approxiamtely 11:45 a.m., ROCK called WHITE and they had the following conversation:

NW: Whats up bro?

ROCK: Hey pull into the um Ikea garage...I ain't there yet...I'm just crossing over right

        now so I'm gonna be about twenty more minutes.

NW: Ok.

ROCK: How far are you?

NW: I'm probably like ten if that...I need to run into the inside (inaudible) my son needs

        shoes real bad.

ROCK: Ok....so go ahead and do that and then just come over there.

NW: Ok.

ROCK: By the time you run in there and run out I should be there.

NW: (inaudible)...Ok...alright...bye.

55.     At approximately 11:58 p.m., agents and officers observed the black Cadillac, driven by WHITE, park near the entrance of Potomac Mills Mall near Bahama Breeze. At that time, agents and officers observed WHITE walking towards the mall wearing a black, leather jacket, dark shirt and glasses and, subsequently, enter the mall.

At approximately 12:13 p.m., agents and officers observed WHITE exit the mall and enter the black Cadillac. At that time, agents and officers observed WHITE drive towards IKEA. At approximately 12:15 p.m., agents and officers observed WHITE park in the front parking lot of the IKEA near the flagpoles. During this time, the following call was intercepted between WHITE and "Rock". WHITE: Bro.

ROCK: What's up where you?

NW:     I'm back there in front of Ikea.

ROCK: Ok...um...I just got off the exit so I'll call you when I pull up right there like two minutes three minutes.

NW:     Ok.

56.     At approximately 12:20 p.m., agents and officers observed a white colored Mercedes drive through the front lot of IKEA, past WHITE'S vehicle, and conduct a U-turn back towards WHITE'S vehicle. At that time, WHITE, driving the black Cadillac, and the white Mercedes followed each other into the internal, covered parking structure of IKEA. During this activity, a call was intercepted between WHITE and "Rock:" WHITE: What's up bro?

28

ROCK: You out front or...I just came through the backway on the side so I'm like right here where the flags and shit are coming up to like where the pickup spot is...where you at?

NW:   Right here in the Cadillac you must be in the white car.

ROCK: That's you right here...the first car?

NW:   Uh-huh

ROCK: Can we get to the garage the other way...to your right?

NW:   I don't know I ain't ever been over there before...I'll just follow you.

ROCK: I'm going to make a U-turn cause I just thought we could get in on the other side (inaudible).

NW:   Ok.

At approximately 12:22 p.m., agents and officers observed the black Cadillac, driven by WHITE, and the white Mercedes parked side by side inside the IKEA parking structure. SA Kazzie confirmed that WHITE was driving the black Cadillac and the Mercedes had a Washington D.C. license plate number of FE 9801. A subsequent records check of Washington D.C. license plate indicates that it is 2016 Mercedes Benz, registered to Ronald Anthony THOMPSON, 1018 F NE, Washington, D.C. 20002. SA Kazzie observed a black male, subsequently identified as Lance Bishop STEGLICH, driving the white Mercedes Benz. At approximately 12:24 p.m., SA Kazzie observed WHITE, driving the black Cadillac, and STEGLICH (a.k.a. ROCK), driving the white Mercedes Benz, exit the internal parking structure of IKEA. Subpoened information from IKEA security footage identifies WHITE and STEGLICH meeting in the IKEA parking structure.

## INTERCEPTS WITH DISTRIBUTORS

57.     On March 20, 2019, at approximately 6:19 p.m., DESKINS called WHITE and told him that the stuff did not look right because he put in the first 21 and it turned brown, meaning that DESKINS was attempting to make crack cocaine with the initial 21 grams of powder cocaine, but it turned brown. DESKINS told WHITE that he attempted to make it in a smaller cup and it turned into a gel. Agents believe that DESKINS was at his place of residence located at 7926 Camp Town Rd., Spotsylvania, VA 22551.

58.     On March 20, 2019, at approximately 8:11 p.m., DESKINS called WHITE and asked WHITE if he wants him to bring back the "bad." WHITE told DESKINS to bring it back to him because WHITE was going to give it all back. A couple of hours later, DESKINS called WHITE and told WHITE that he was "out back." WHITE told DESKINS that he was at his house not the "same spot" referring to the Tint Lab. WHITE told DESKINS to come to the house.

59.     On March 22, 2019, at approximately 8:23 p.m., WHITE called DESKINS and asked DESKINS to "put that on that thing and tell me what it is", meaning put the cocaine on the scale and tell me what it says. DESKINS placed the cocaine on the scale and told WHITE that it says "107", meaning 107 grams of cocaine (approximately 3.77 ounces of cocaine). WHITE advised DESKINS that he gave him the wrong bag of cocaine, and DESKINS replied "you alright, I know you good for it", indicating that WHITE had given DESKINS a smaller quantity of cocaine than what DESKINS had paid for. DESKINS reply indicates that he knows that WHITE will make up the difference on the next purchase of cocaine. WHITE told DESKINS that he was going to Cowboy Jack's tonight. DESKINS told WHITE that he had to go to bed.

Agents believe that DESKINS was at his place of residence located at 7926 Camp Town Rd.,

Spotsylvania, VA 22551 during this call.

60.      On April 2, 2019, agents intercepted a call from WHITE to his nephew, Marquis

WHITE, aka "Dotchi" during which Dotchi told Nathaniel WHITE that he is riding with his

cousin, "House." WHITE told Dotchi that he did not want anyone coming to his house and the

two agreed to meet at the "Amish market," which is the Battlefield Country Store, located at

6150 Plank Road, Fredericksburg, Virginia, in the vicinity of the SUBJECT PREMISES. During

this phone conversation, agents were also monitoring real time court ordered location data which

indicated that WHITE was at the SUBJECT PREMISES during this conversation. The

coordinates provided from the location data indicated that WHITE'S phone was within 209 feet

of the SUBJECT PREMISES. WHITE told Dotchi that he had one for him already and asked

how Dotchi was coming. Dotchi told WHITE that he has the "seven five", (likely referring to

having either 75 percent of the money he needs or having $7500), and is looking for the whole,

"you know the normal the work." WHITE told Dotchi that he was trying to figure where they

were. Dotchi told WHITE "Yeah yeah you told me you said I only owed you a dub on the last

one that's why I gave you the whole thing back to you, and I owe you one, so when you say I

owe you one, I said alright, so then after that I made sure he said that's the number I said alright I

got seven five, you know what I mean?" WHITE replied: "I got you" and the two agreed they

were on their way to meet. About 15 minutes later, Dotchi called WHITE again and told

Nathaniel WHITE that he was there. WHITE said he would be there in just a second. Agents

watching the Battlefield Market observed Dotchi arrive with Robert Lamont Williams and

another male in a gray Nissan sports utility vehicle. Approximately 8 minutes later, WHITE

arrived in a black Cadillac and Dotchi and WHITE met at WHITE's car. The two met for only a few minutes, before leaving the area.

61.     Also on April 2, 2019, agents intercepted conversations between WHITE and DESKINS in which DESKINS asked WHITE if WHITE had "something over there with my name on it?" WHITE told DESKINS not at the moment but indicated he was going to. Not long after that call, WHITE received another call in which the caller asked WHITE if he ever got "straight," which is common parlance for whether WHITE had resupplied with drugs. WHITE replied, he was "semi" and "grabbed a little something, nothing major though." WHITE then told the caller that it was "too hot to go hot...to go hard right now," indicating that there was a high police presence and people were being arrested. Shortly after that call, Dotchi called WHITE and told WHITE that he was waiting on him. Approximately forty-five minutes later, WHITE called Dotchi back and told him he was "walking out of his house and coming down 3."

62.     On April 07, 2019, at approximately 2:32 p.m., WHITE called DESKINS and they discussed a mutual acquaintance they call "KEETEE". WHITE told DESKINS that "KEETEE" was arrested again for riding "dirty." "Riding dirty" is common drug parlance for riding in a car with illegal drugs. DESKINS told WHITE that he just "threw him a whole one," meaning DESKINS just sold "KEETEE" one ounce of cocaine. Agents identified "KEETEE," who is now a DEA Confidential Source (hereinafter, "CD-3"). CD-3 was arrested on April 04, 2019, and found to be in possession of four (4) grams of cocaine. On Wednesday, June 5, 2019, agents debriefed CD-3 regarding Perry DESKINS. CD-3 stated that he/she began purchasing cocaine from DESKINS sometime in January or February 2019. CD-3 advised that he/she would purchase half-ounce quantities of powder cocaine from DESKINS for $700.00 USC. CD-3 stated that, on April 04, 2019, CD-3 had purchased approximately 1/2 ounce of powder cocaine

from Perry DESKINS sometime during the early evening hours.  CD-3 stated that DESKINS

was driving a dark colored Honda Element type vehicle.  CD-3 advised that he/she was arrested

shortly thereafter.

63.      On April 9, 2019, agents sought to renew the wire and electronic intercept order

on WHITE'S cellphones.  The Order for continuing intercepts was signed and on April 10, 2019,

WHITE dropped both of his phones the next morning.

### POST-INTERCEPT SURVEILLANCE

64.      In an effort to identify WHITE'S new phones, agents sought and received a Court

order allowing for a cell-site simulator ("CSS").  Utililziing the CSS, agents were able to identify

a new cellphone number for WHITE.  According to provider records, the new phone was

subscribed in the name of Nathaniel WHITE at 202 Frederick Street, Fredericksburg, VA 22401

and activated on April 10, 2019.  Law Enforcement databases identified that Nathaniel WHITE

was listed at that address in 2016; Marquis WHITE (aka DOTCHI), who is Nathaniel WHITE'S

nephew and right hand man within the WHITE DTO was listed at the same address in December

of 2018.  Marquis WHITE was utilizing telephone number 540-621-0891 during the course of

the wire intercept.  This number is subscribed to Travis Moore, 202 Frderick street,

Fredericksburg, VA 22401.  Toll records indicated that WHITE's new phone was not being

utilized to contact WHITE's supplier or distributors in the same manner as he did on his prior

phones. Agents suspect that WHITE had obtained an additional phone, but were unable to

identify any other phone utilized by WHITE.

65.      During the course of the utilizing the CSS, agents conduct surveillance on the

SUBJECT PREMISES and other locations utilized by WHITE.  During those surveillances,

agents observed WHITE operating a maroon colored Lexus 4-door sedan, bearing Virginia

Independent Dealer tags that came back to "Headliners Auto," a car dealership utilized by WHITE. Agents suspect that the business is in part a front for WHITE's drug trafficking activities and is utilized to launder illegal drug proceeds.

66.   On August 8, 2019, agents conducted surveillance on the SUBJECT PREMISES and confirmed that WHITE is still residing at the SUBJECT PREMISES.

67.   Based on the foregoing, there is probable cause to believe that WHITE has combined, conspired, confederated and agreed with others, known and unknown, to distribute cocaine, a Schedule II controlled substance and has distributed cocaine in and around the Fredericksburg Metropolitan area for several years. Furthermore, there is probable cause to believe that over the last five years the DTO members have sold and continue to sell $20,000 or more in cocaine each month and that there would be substantial amounts of currency being amassed on a weekly basis and transported for the purposes of resupplying the members of the conspiracy with cocaine to sell. Because the DTO's drug trafficking activities have been ongoing for over five years, there is probable cause to believe that evidence, fruits and instrumentalities of the conspiracy, as more fully described in Attachment B and incorporated by reference herein, would be found in and on the SUBJECT PREMISES.

Further your affiant sayeth not.

_____
Special Agent Nagi F. Kazzie
Drug Enforcement Administration

Sworn to and subscribed before me this __3ʳᵈ__ day of ~~August~~ September, 2019, in Richmond, Virginia

_____
/S/
David J. Novak
United States Magistrate Judge

34